# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

DONSHUR L. OLIVER,  )
                            )
          Plaintiff,      )
                            )
v.                           )      Civil Action No. 3:17CV492–HEH
                            )
VIRGINIA BOARD OF BAR     )
EXAMINERS, *et al.*,         )
                            )
          Defendants.    )

## MEMORANDUM OPINION
### (Granting Defendants' Motion to Dismiss)

Donshur L. Oliver ("Plaintiff") brings this action against the Virginia Board of Bar Examiners ("Board") and Catherine Crooks Hill[1] (collectively, "Defendants"), seeking declaratory relief, injunctive relief, and compensatory damages for the Board's alleged discrimination in its administration of the Virginia Bar Examination. Specifically, Plaintiff claims that the Board did not properly accommodate his disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 1201, *et seq.*, as amended, the Rehabilitation Act, 29 U.S.C. §§ 794, *et seq*, and the Fourteenth Amendment to the United States Constitution. The matter is presently before the Court on Defendants' Motion to Dismiss Plaintiff's Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure (ECF No. 17). The parties have thoroughly briefed the underlying issues, and the Court heard oral argument on the

---

[1] Defendant Hill is Secretary and Treasurer for the Board.

Motion on March 22, 2018. The matter is accordingly ripe for decision. For the reasons discussed below, Defendants' Motion to Dismiss will be granted.

## I. BACKGROUND

Plaintiff enrolled at Western Michigan University Cooley Law School in 2012. (Am. Compl. ¶ 18, ECF No. 12.) During his first semester Plaintiff sought a psychological evaluation, as a result of which Dr. John Braccio diagnosed him with "ADHD predominately inattentive type (Guarded) and an Adjustment Disorder with Mixed Anxiety and Depressed Mood." (*Id.* at ¶ 19.) While in law school at Western Michigan, Plaintiff took a reduced course load and received extra time on his exams. (*Id.* at ¶¶ 20, 21.) In January of 2015, Plaintiff transferred to Michigan State University College of Law, where he also received extra time on exams; he received additional accommodations in the form of "a 30 minute break for any exam that exceed[ed] four (4) hours and a separate exam room or reduced distraction environment if [a] separate room [was] not available." (*Id.* at ¶ 23.)

In anticipation of applying to take the Virginia Bar Examination, in 2016 Plaintiff obtained an updated psychological evaluation, this time from a different clinical psychologist, Dr. Jennifer Thompson. (*Id.* at ¶ 25.) She diagnosed Plaintiff "with a Specific Reading Disorder . . . and Major Depressive Disorder, Single Episode, Mild." (*Id.* at ¶ 26.) In his subsequently filed Bar Application, Plaintiff requested testing accommodations, specifically "additional testing time, use of a reader, separate testing area, and a private testing room." (*Id.* at ¶ 28.) Plaintiff supplemented his application

and request for accommodations with the necessary forms and records of his psycho-logical evaluations, as well as other supporting documentation. (*Id.* at ¶¶ 27, 30–32.)

Bar applications are submitted to and reviewed by the Board, which is a public entity and an agency of the Supreme Court of Virginia. (*Id.* at ¶ 8.) The Board is responsible for administering the Bar Examination and otherwise ascertaining the qualifications of applicants for admission to the Bar of Virginia. (*Id.*) It is also responsible for issuing disability-accommodation decisions; petitions for accommoda-tions are reviewed on a case-by-case basis in accordance with the ADA, as amended by the ADA Amendments Act of 2008 ("ADAAA"), and controlling interpretive case law. (*Id.* at ¶¶ 83, 84.)

On June 9, 2016, the Board denied Plaintiff's request for accommodations by letter, stating that the Board's expert reviewing Plaintiff's claimed disability found that the clinical documentation did not support the request for additional time. (*Id.* at ¶ 36.) On June 23, 2016, Plaintiff filed a request for reconsideration with the Board; he included a letter from Dr. Thompson outlining why she believed Plaintiff fit the criteria for a Specific Learning Disability. (*Id.* at ¶ 43.) In his request for reconsideration, Plaintiff also increased his requested time-accommodation, "because he . . . learned that there is more reading on the Virginia Bar Examination than he first understood." (*Id.* at ¶ 44.) On July 6, 2016, the Board affirmed its denial of Plaintiff's requested accommodations; Plaintiff did not appeal this denial further. (*Id.* at ¶ 45.)

As a result of the Board's decision, Plaintiff took the Virginia Bar Examination without accommodation. (*Id.* at ¶ 56.) On October 20, 2016, Plaintiff learned that he did

not pass the Bar, and that he missed the passing score by three points. (*Id.* at ¶¶ 59, 60.)

Plaintiff subsequently took the Michigan Bar Examination, with accommodations, and

passed. (*Id.* at ¶¶ 65, 66.) He now works as an attorney in Michigan; however, he desires

to practice in Virginia, his home state. (*Id.* at ¶¶ 67, 68.) Accordingly, he brings this

action.

In Count One of the Amended Complaint, Plaintiff alleges that the Board

unlawfully denied him accommodations to which he was entitled pursuant to the ADA

(*Id.* at ¶¶ 102–03). In Count Two, Plaintiff alleges that the Board unlawfully

discriminated against him and other individuals with disabilities through its acts and the

policies, practices, and guidelines in place at the time of his application to the Virginia

Bar, in violation of the anti-discrimination requirements of § 504 of the Rehabilitation

Act. (*Id.* at ¶¶ 113–14.) Finally, Plaintiff alleges in Count Three that the Board violated

Plaintiff's fundamental right to pursue his chosen profession, and that its policies,

practices, and procedures deny him and others like him equal access to the Virginia Bar

Examination and to the legal profession. (*Id.* at ¶¶ 120–22.) Plaintiff seeks declaratory

and injunctive relief, as well as compensatory damages in the amount of $100,000.00.[2]

## II. LEGAL STANDARDS

A motion made pursuant to Fed. R. Civ. P. 12(b)(1) challenges the court's

jurisdiction over the subject matter of a complaint. Such challenges can be facial,

asserting that the facts as pled fail to establish jurisdiction, or factual, disputing the

---

[2] Among the relief requested in the Amended Complaint is for the Court to "[o]rder the Defendant to grant Plaintiff a passing score on the Virginia State Bar." (Am. Compl. 20.) Acknowledging the Court's strong reservations regarding the Tenth Amendment implications of this remedy, counsel for Plaintiff withdrew this particular request for relief at oral argument on Defendants' Motion to Dismiss.

pleadings themselves and arguing that other facts demonstrate that no jurisdiction exists. If a defendant raises a factual challenge, "the district court may then go beyond the allegations of the complaint and resolve the jurisdictional facts in dispute by considering evidence outside the pleadings, such as affidavits." *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2008). Consideration of evidence outside of the pleadings on a 12(b)(1) motion does not necessarily convert the motion to one for summary judgment. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (citation omitted); *McBurney v. Cuccinelli*, 616 F.3d 393, 409 (4th Cir. 2010) (Agee, J., concurring in part and dissenting in part) (motions under Rule 12(b)(1) are not restricted by Rule 12(d)). Regardless of whether the challenge is facial or factual, the plaintiff bears the burden of proof to preserve jurisdiction. *Jadhav*, 555 F.3d at 348; *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

Meanwhile, "[a] motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted). To survive a Rule 12(b)(6) challenge, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2). To do so, it must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Mere labels and conclusions declaring that

the plaintiff is entitled to relief are not enough. *Id.* Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level" to a level that is "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570 (citations omitted). In considering such a motion, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *T.G. Slater & Son v. Donald P. & Patricia A. Brennan, LLC*, 385 F.3d 836, 841 (4th Cir. 2004) (citing *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). Legal conclusions enjoy no such deference. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### III. DISCUSSION

The Court notes as an initial matter that, while Catherine Crooks Hill is named as a Defendant in this action, her only mention in the Amended Complaint is in a single paragraph, which introduces her as "an officer of the [Board], namely Secretary and Treasurer." (Am. Compl. ¶ 10.) Moreover, none of Plaintiff's allegations are levelled against Defendants, in the plural, but rather against "Defendant," singular, or simply "the VBBE" (Plaintiff's label for the Board). Finally, Plaintiff introduces his Amended Complaint by saying that he "states the following . . . against the defendant, the Virginia Board of Bar Examiners (VBBE): . . . ." (*Id.* at 1.) As such, the Court finds that Plaintiff has failed to allege any facts that would put Defendant Hill on notice of any claims asserted against her, personally. *See Twombly*, 550 U.S. at 555.

To the extent Plaintiff endeavors to use Defendant Hill to preserve jurisdiction through the *Ex Parte Young* doctrine, the attempt fails. *Ex Parte Young* is a jurisdictional "fiction" that enables a plaintiff to enjoin government officials in their official capacities

from perpetuating violations of constitutional or federal statutory rights, usually where sovereign immunity bars a suit against the government entity itself. *Antrican v. Odom*, 290 F.3d 178, 184 (4th Cir. 2002). In this case, however, Defendants are correct that Plaintiff has failed to allege any actions by Defendant Hill in her individual capacity which, if enjoined, would provide the relief Plaintiff seeks.[3] Accordingly, the Court finds that *Ex Parte Young* does not apply, and to the extent that Plaintiff endeavored to state any claims against Defendant Hill, those claims will be dismissed

More generally speaking, with respect to Plaintiff's claims against the Board, Defendants argue that the Complaint as a whole should be dismissed because the Court lacks jurisdiction pursuant to the *Rooker-Feldman* doctrine. Alternatively, Defendants argue that Counts One and Two should be dismissed in recognition of the Board's sovereign immunity and that Count Three should be dismissed for failure to state an equal protection claim. For the reasons set forth below, the Court agrees.

A.      **The Court Lacks Subject Matter Jurisdiction Pursuant to *Rooker-Feldman***

The *Rooker-Feldman* doctrine prevents lower federal courts from hearing cases where a plaintiff, under the auspice of bringing a constitutional claim, seeks "review of, or relief from, a state action or proceeding that is essentially judicial in nature." *Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 228 (4th Cir. 1997) (citing *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Ct. App. v. Feldman*, 460 U.S. 462

---

[3] *Pickering v. Virginia State Police*, relied on by Plaintiff, is distinguishable insofar as the complaint in that case alleged that the state entity performed its unlawful conduct under the administration of the defendant individual. Such is not the case here. As stated above, the Amended Complaint contains one bare sentence introducing Defendant Hill; nothing else in the pleadings or presented at the hearing demonstrated that Defendant Hill had individual control over the actions or decisions of the Board or otherwise personally caused the constitutional violations Plaintiff allegedly suffered.

(1983)). The doctrine applies where a plaintiff brings a claim in federal court that was actually adjudicated by a state court or inextricably intertwined with the state court's judgment, or where the plaintiff otherwise had the opportunity to raise that claim during state proceedings. *See Feldman*, 460 U.S. at 482 n.16 (1983). "[I]f 'in order to grant the federal plaintiff the relief sought, the federal court must determine that the state court judgment was erroneously entered or must take action that would render the judgment ineffectual,' *Rooker-Feldman* is implicated." *Jordahl v. Democratic Party*, 122 F.3d 192, 202 (4th Cir. 1997).

Defendants contend that by bringing the present action, Plaintiff is in actuality asking the Court to overturn the outcome of a state judicial proceeding. (Mem. Supp. Mot. Dismiss 13–14, ECF No. 18.) Among Plaintiff's desired relief is that the Court declare that Defendant violated Plaintiff's rights under the ADA and the Rehabilitation Act by not providing Plaintiff the accommodations that he believes he was entitled to, and for the Court to "require Defendant to accommodate Plaintiff on any future bar examinations." (Am. Compl. 20–21.) Plaintiff primarily argues that the Board's decision to deny his requested accommodations was not a judicial function, taking the issue outside the purview of *Rooker-Feldman*.

It is undisputed that the Board is an agency of the Supreme Court of Virginia. The critical question for the Court to determine, therefore, is whether or not the Board proceedings underlying this action were "judicial in nature," as opposed to administrative or ministerial processes. If the Court concludes that the proceedings were in fact judicial, it must then consider whether, in the course of those proceedings, the state court actually

adjudicated Plaintiff's claims, or whether Plaintiff has waived adjudication by failing to bring his claims before the state court when it was proper to do so.

## 1. The Board's Accommodations Decision was Judicial in Nature

"In evaluating the [Board]'s proceedings to assess their judicial character, we examine the nature and effect of the proceeding and not the form of it." *Allstate Ins. Co. v. W. Va. State Bar*, 233 F.3d 813, 817 (4th Cir. 2000) (citing *Feldman*, 460 U.S. at 477). In *District of Columbia Court of Appeals v. Feldman*, the United States Supreme Court found that the D.C. Court of Appeals[4] engaged in a judicial act when it denied Feldman and Hickey waivers that would have allowed them to take the D.C. Bar Examination despite not having graduated from an accredited law school. The Supreme Court considered and expressly rejected the characterization of the D.C. Court's determination as administrative or ministerial. It based its finding on the fact that "the proceedings before the [D.C.] Court of Appeals involved a 'judicial inquiry' in which the court was called upon to investigate, declare, and enforce 'liabilities as they [stood] on present or past facts and under laws supposed already to exist.'" *Feldman*, 460 U.S. at 479 (second alteration in original) (quoting *Prentis v. Atlantic Coast Line*, 211 U.S. 210, 226 (1908)). When considering Feldman's petition, the D.C. Court of Appeals weighed Feldman's

---

[4] By act of Congress, the D.C. Court of Appeals is authorized to "make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar . . . ." § 111, 84 Stat. 521 (codified at D.C. Code § 11-2501(a) (1981)). Accordingly, it holds a position analogous to that of the Board, which was created by act of the Virginia General Assembly and made "responsible for the examination of applicants and otherwise ascertaining the qualifications of applicants for admission to the bar[,]" and further authorized to "do, or cause to be done, all things it considers necessary, convenient, or expedient in connection with the preparation, conduct and grading of examinations, in determining the qualifications of applicants, [and] in determining the requirements for taking and passing examinations . . . ." Va. Code §§ 54.1-3919, 54.1-3922 (2013).

arguments, the circumstances of his petition, and the court's existing rules and standards for Bar qualification. *Id.* at 480. Ultimately, it "determined as a legal matter that Feldman was not entitled" to the relief he sought: waiver of certain established rules and prerequisites of admission to the D.C. bar. *Id.*

In this case, the Board engaged in a similar adjudication when it evaluated Plaintiff's request for accommodation and ultimately denied it. Just as the D.C. Court of Appeals considered Feldman's and Hickey's requests for waiver from certain qualification requirements, the Board considered Plaintiff's request for "waiver" from the time constraints and other standardized test-taking procedures that normally apply to Virginia Bar examinees. The Board was presented with competing expert reports regarding Plaintiff's disability, and it had to determine based on those reports, Plaintiff's medical and academic records, relevant law, and its own experience and precedents whether it should grant the requested accommodations.

Plaintiff attempts to argue that the Board performed a ministerial act because it makes its accommodations determination according to guidelines and definitions set by the ADA. (Br. Opp. Mot. Dismiss, 14–15.) However, this fact actually cuts against Plaintiff's position. Just as in *Feldman*, where the Supreme Court found that the D.C. Court of Appeals "determine[d] in light of existing law and in light of Feldman's qualifications and arguments whether Feldman's petition should be granted," the Board determined in light of existing law (the ADA) and Plaintiff's medical and academic records whether his petition for accommodations should be granted. As the Supreme

Court stated in *Feldman*, this sort of adjudication of current "rights" "is the essence of a judicial proceeding." 460 U.S. at 481.

In light of *Feldman*, the Court agrees with Defendants and finds that this undertaking demonstrates an exercise of judicial judgment and therefore constitutes a judicial proceeding. Plaintiff's arguments to the contrary, particularly those focusing on the form of the proceedings, are unavailing. *Compare* Pl. Supp. Br. 4–5, ECF No. 36, *with Feldman*, 460 U.S. at 479–482 ("Admittedly, the proceedings . . . did not assume the form commonly associated with judicial proceedings . . . . however, 'the form of the proceeding is not significant. It is the nature and effect which is controlling." (quoting *In re Summers*, 325 U.S. 561, 567 (1945)).

The Court's finding aligns with that of the Fourth Circuit in *Allstate Insurance Company v. West Virginia State Bar*. In that case, the Fourth Circuit found that the West Virginia State Bar, an agency of the Supreme Court of Appeals of West Virginia and authorized to regulate the practice of law on its behalf, engaged in judicial decision-making processes when it determined that Allstate was engaging in the unauthorized practice of law. *Allstate*, 233 F.3d at 817–18. Just as the Supreme Court recognized in *Feldman* that "the form of the proceeding is not significant[,]" 460 U.S. at 482, the Fourth Circuit was not deterred by the fact that the West Virginia State Bar "was not a judicial body and the committee's proceedings did not possess any judicial characteristics." *Allstate*, 233 F.3d at 816. Rather, the Court of Appeals took into consideration the nature and effects of the state bar's proceedings—namely, that it performed an independent investigation, applied the facts to its own regulations and state

Supreme Court precedents, and made a decision. *Id.* at 817. Importantly, "[t]he committee did not look into the future and announce a new regulation applicable to all bar members. Instead, it ruled on a particular case pursuant to current law." *Id.* Based on *Feldman* and *Allstate*, therefore, the Court finds that the Board performed a judicial function when it denied Plaintiff's petition for accommodations on the Virginia bar examination.

## 2. Plaintiff Had the Opportunity for Actual Adjudication of His Claims in State Court

Having determined that the Board performed a judicial function when it denied Plaintiff's accommodations petition, the Court must now examine whether the specific claims Plaintiff brings here were either actually adjudicated by the state court or were otherwise inextricably intertwined with the issues in the state judicial proceeding. *See Feldman*, 460 U.S. at 482; *Allstate*, 233 F.3d. at 818–19. "A federal claim is inextricably intertwined with the state-court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it.'" *Id.* at 819 (quoting *Pennzoil Corp. v. Texaco, Inc.*, 481 U.S. 1, 25 (1987) (Marshall, J., concurring)).

The list of Remedies sought in the Amended Complaint makes clear that Plaintiff seeks a determination by this Court that the state court, through the Board, wrongly applied the ADA in deciding the merits of his petition for accommodations. Moreover, although it does not appear that Plaintiff necessarily presented ADA-specific or constitutional arguments to the Board in his petition or request for reconsideration, Plaintiff had the opportunity to raise those arguments in an appeal of the Board's decision

to the Virginia Supreme Court.[5] Despite the settled rule that "a plaintiff is not entitled to bring [a] claim in federal court if the claim was one that should have been brought in the state court," Plaintiff brings this suit in lieu of filing such an appeal. *See id.* (quoting *Guess v. Bd. of Med. Exam'rs*, 967 F.2d 998, 1003 (4th Cir. 1992)); *see also Feldman*, 460 U.S. at 482 n.16.

Plaintiff claims that he did not appeal the Board's decision because he was misled by the language in a letter accompanying his Bar Examination results. This letter stated: "There is no additional review or regrading of your essay examination score and no additional score information is available." (Br. Opp. Mot. Dismiss 16.) Plaintiff takes the position that, in light of this language, to tell him that "he may request Virginia Supreme Court review of the Board's decisions after explicitly stating that the decision is unreviewable is disingenuous." (*Id.*) If the Court were to find anything disingenuous in the papers before it, it would be this argument. There is no connection between Plaintiff's ability to appeal the Board's accommodations decision and the letter conveying his examination results. The temporal gap alone renders Plaintiff's professed confusion incredible; Plaintiff received word that the Board denied his request for reconsideration on July 6, 2016, while Bar results were not released until October 20, 2016. Moreover, the text of the letter clearly states that it is the recipient's "essay examination score" that is unreviewable. Nothing more. To say that Plaintiff—a

---

[5] While the Supreme Court of Virginia's authority to hear appeals of Board decisions is not codified into any statute, "it is well settled that the [Virginia Supreme] Court retains such inherent power." *Woodard v. Va. Bd. of Bar Exam'rs*, 454 F. Supp. 4, 5 (E.D. Va. 1978), *aff'd* 598 F.2d 1345 (4th Cir. 1979); *see also Rogers v. Sup. Ct. of Va.*, 590 F. Supp. 102, 108–09 (E.D. Va. 1984), *cert. denied* 475 U.S. 1086 (1986).

graduate of law school—was misled by this letter is frankly inconceivable. Because

Plaintiff failed to take his claims to the Virginia Supreme Court, an avenue entirely open

to him, the Court finds that he has "forfeit[ed] his right to obtain review of the state-court

[sic] decision" in this Court. *Feldman*, 460 U.S. at 482 n.16; *Allstate*, 233 F.3d. at 819.[6]

Plaintiff attempts to circumvent this conclusion by arguing that he presents a

generalized constitutional challenge to the Board's practices and procedures rather than

an individualized appeal of a state proceeding, and that therefore the Court should hear

the dispute. (Br. Opp. Mot. Dismiss 16.) The Court is not persuaded. Plaintiff has not

demonstrated that the Board's policies and standards amount to constitutional violations,

such that this Court's intrusion into the state's business of regulating the state bar would

be justified. *See Feldman*, 460 U.S. at 483 n.16 ("Finally, it is important to note in the

context of this case the strength of the state interest in regulating the state bar."); *Allstate*,

233 F.3d at 817 ("In conducting this analysis we are mindful of the weight given by the

Supreme Court to federal-state comity concerns that arise out of federal review of state

bar proceedings . . . ."). For the reasons stated in greater detail below, *infra* Part III.D.,

the Court finds that Plaintiff has failed to state a claim for violation of the Fourteenth

Amendment; as a result, there is no valid constitutional challenge—general or

---

[6] Plaintiff argues that the Court cannot find that Plaintiff was subject to any requirement that he "exhaust any administrative remedies . . . before filing suit." (Br. Opp. Mot. Dismiss 16.) The Court does not do so. Rather, its decision is based on the Supreme Court's reasoning in *Feldman*: that a plaintiff's failure to avail himself of the opportunity to raise a constitutional claim in state court may not open the door to lower federal court jurisdiction, when that jurisdiction would not exist had he done so. *Feldman*, 460 U.S. at 482 n.16 ("This result is eminently defensible on policy grounds. We have noted the competence of state courts to adjudicate federal constitutional claims. We also noted . . . the desirability of giving the state court the first opportunity to consider a state statute or rule in light of federal constitutional arguments. A state court may give the statute a saving construction in response to those arguments. Finally, it is important to note in the context of this case the strength of the state interest in regulating the state bar." (citations omitted)).

otherwise—for this court to consider. *Cf. Feldman*, 460 U.S. at 482–83 ("To the extent that Hickey and Feldman mounted a general challenge to the constitutionality of Rule 46 I(b)(3), however, the District Court did have subject matter jurisdiction over their complaints.").

For the foregoing reasons, the Court finds that the *Rooker-Feldman* doctrine precludes the Court from exercising jurisdiction over Plaintiff's claims, and the Amended Complaint should be dismissed.

Although the Court's analysis could end here, in recognition of the fact that the Fourth Circuit has not previously addressed the application of the *Rooker-Feldman* doctrine to erstwhile appeals of Board decisions in the specific context of Bar Examination accommodations, the Court will proceed to address the alternative grounds for dismissal.

**B.    Sovereign Immunity Bars Plaintiff's ADA Claim**

In Count One, Plaintiff alleges that the Board violated Titles II and III of the ADA by failing to offer and administer the Bar Examination in a manner that best ensures "that the examination results for an individual with a disability accurately reflect the individual's aptitude . . . rather than reflecting the individual's disability." (Am. Compl. ¶¶ 74–81.) Specifically, Plaintiff claims that the Board did not apply the proper standards in evaluating his request for testing accommodations, thereby discriminating against him. (*Id.* ¶ 102.) Plaintiff's ADA claim fails for two reasons. First, Title III of the ADA only

applies to private entities, *see* 42 U.S.C. §§ 12181, *et seq*,[7] so to the extent Plaintiff

attempts to state a claim under Title III, that claim will be dismissed. Second, the Court

finds that Plaintiff has failed to establish that Congress validly abrogated Virginia's

sovereign immunity for purposes of applying Title II of the ADA to state-regulated

professional licensing.

The Eleventh Amendment to the United States Constitution establishes that the

states may not be sued by private individuals in federal court. *Bd. of Trs. v. Garrett*, 531

U.S. 356, 363 (2001). This immunity extends to the "agents and instrumentalities" of the

states as well. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997). As an arm

of the Supreme Court of Virginia, therefore, the Board enjoys the state's sovereign

immunity. However, such immunity is not absolute.

"Congress may abrogate the [s]tates' Eleventh Amendment immunity when it both

unequivocally intends to do so and 'acts pursuant to a valid grant of constitutional

authority.'" *Garrett*, 531 U.S. at 363 (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62,

73 (2000)). Congress's unequivocal intent to abrogate sovereign immunity is not in

dispute with regard to the ADA. *See* 42 U.S.C. § 12202 ("A State shall not be immune

under the [E]leventh [A]mendment to the Constitution of the United States from an

action in Federal or State court of competent jurisdiction for a violation of this chapter.").

Accordingly, the question before the Court is whether the ADA constitutes a valid

exercise of Congress's constitutional authority when applied to the facts at hand.

---

[7] The "Prohibitions" of Title III apply to "discrimination by public accommodations," 42 U.S.C. § 12182, and "discrimination in specified public transportation services provided by private entities," 42 U.S.C. § 12184. For purposes of Title III, the definition of "public accommodations" is limited to an enumerated list of private entities. 42 U.S.C. § 12181.

In enacting the ADA, Congress invoked its authority "to enforce the [F]ourteenth [A]mendment and to regulate commerce . . . ." 42 U.S.C. § 12101(b)(4). While the Supreme Court has held that the commerce power is insufficient authorization to abrogate sovereign immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 72–73, it has found that Congress may validly abrogate a state's sovereign immunity in order to "exercise its power under § 5 of the Fourteenth Amendment to enforce the substantive guarantees of that amendment." *Tennessee v. Lane*, 541 U.S. 509, 518 (2004) (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976)). "Accordingly, the ADA can apply to the States only to the extent that the statute is appropriate § 5 legislation." *Garrett*, 531 U.S. at 364.

Section 5 grants Congress "the authority both to remedy and to deter violation of rights guaranteed [by the Fourteenth Amendment] by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Lane*, 541 U.S. at 518 (quoting *Kimel*, 528 U.S. at 81). In that vein, § 5 authorizes Congress to enact "prophylactic legislation" proscribing "facially constitutional conduct, in order to prevent and deter unconstitutional conduct" and to carry out the basic objectives of the Equal Protection Clause. *Nev. Dep't of Human Resources v. Hibbs*, 538 U.S. 721, 726 (2003). Nevertheless, such authorization is not unlimited: legislation passed under the guise of § 5 authority is only valid "if it exhibits 'a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" *Lane*, 541 U.S. at 520 (quoting *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997)). Neither the Supreme Court nor the Fourth Circuit have addressed whether or not Title II is a valid exercise of Congress's § 5 authority in the context of professional

licensing cases. However, the Supreme Court has established a framework for analyzing § 5 abrogation, which the Court applies here.

The first step in a § 5 analysis is to identify whether or not the constitutional right purportedly enforced by the challenged legislation is fundamental. *Id.* at 522. The second step is to consider the extent to which the statute is "responsive to, or designed to prevent, unconstitutional behavior." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 487 (4th Cir. 2005) (quoting *City of Boerne*, 521 U.S. at 532). This inquiry focuses on evidence of historical constitutional violations. *Id.* The final step is to determine whether the remedial legislation "represent[s] a congruent and proportional response to this demonstrated history and pattern of discrimination." *Id.* at 488. If it is a fundamental right guaranteed by the Fourteenth Amendment, then the Court's "congruent and proportional" analysis may be more easily satisfied, as "less evidence [is] required to establish a pattern of unconstitutional conduct" and stronger measures will be deemed permissible to address the historical wrong. *Id.* at 485 n.6, 486. However, if Congress seeks to enforce a non-fundamental right, those same strong measures may "exceed[] what the Constitution requires." *Id.* at 486 (quoting *Lane*, 541 U.S. at 532 n.20). If the legislation is not congruent and proportional, it is not a valid exercise of Congress's § 5 authority.

## 1. Title II does not Enforce a Fundamental Right in Professional Licensing Cases

Defendants argue that, as applied in this case, Title II of the ADA is prophylactic legislation seeking to enforce non-fundamental rights, and that it is an unconstitutionally

broad exercise of Congress's § 5 authority. (Mem. Supp. Mot. Dismiss 9–10.) In contrast, Plaintiff argues that Title II addresses fundamental rights guaranteed by the Fourteenth Amendment, and that therefore its scope is appropriately broad and fully constitutional. Particularly, Plaintiff argues that, in the context of professional examinations, Title II protects the fundamental right of "access to the Courts" and the fundamental right "to pursue one's profession or common calling." (Br. Opp. Mot. Dismiss 6–7 (internal quotations omitted) (citing *Lane*, 541 U.S. at 523; *McBurney v. Young*, 667 F.3d 454, 463 (4th Cir. 2012)). Plaintiff's position is flawed.

To begin with, the right of access to the courts discussed in *Lane* is not a right to practice law and represent a client before the courts. Rather, the Supreme Court was concerned with a criminal defendant's right to be present during trial and to confront witnesses against him, with a civil litigant's right to a meaningful opportunity to be heard, and with the public's right to attend—i.e., *physically* access—court proceedings. *See Lane*, 541 U.S. at 523. Generally speaking, the Supreme Court found in *Lane* that the Title II was enacted, in relevant part, to remedy "a pattern of unconstitutional treatment in the *administration* of justice." *Id.* at 525 (emphasis added). Despite Plaintiff's eagerness to avail himself of the precedent set by *Lane*, he has cited no authority to suggest that "the alleged right of access to a licensing examination, or to a license itself, is either akin to or a part of the fundamental right of access to the courts." *Turner v. Nat'l Council of State Bds. of Nursing, Inc.*, 561 F. App'x 661, 666 (10th Cir. 2014).

Similarly, the right to pursue one's chosen profession or common calling is not a fundamental right guaranteed by the Fourteenth Amendment. The case Plaintiff relies on

to claim a fundamental right to practice law in Virginia, *McBurney v. Young*, involves an Article IV Privileges and Immunities Clause analysis. *See* 667 F.3d at 463. This is wholly distinguishable from a Fourteenth Amendment fundamental rights analysis. *See Tolchin v. Sup. Ct. N.J.*, 111 F.3d 1099, 1114 (3d Cir. 1997) ("'[F]undamental' privileges and immunities are not interchangeable with the rights deemed 'fundamental' for equal protection purposes."), cert. denied, 522 U.S. 977 (1997); *see also Friedman v. Sup. Ct. of Va.*, 822 F.2d 423, 426 (4th Cir. 1987) (recognizing that "the Privileges and Immunities Clause protects more [rights] than those rights which are considered fundamental individual rights protected by the Fourteenth Amendment."), aff'd 487 U.S. 59 (1986). Moreover, the Supreme Court has held that "[t]he Constitution does not guarantee the unrestricted privilege to engage in a business," *Nebbia v. New York*, 291 U.S. 502, 527–28 (1934), and "the right to . . . pursue a calling[] may be conditioned." *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 439 U.S. 96, 107 (1978) (quoting *Nebbia*) (analyzing the right to pursue a business or trade in the Fourteenth Amendment context). Accordingly, the Court finds that the Fourteenth Amendment does not guarantee any fundamental right to become a state-licensed attorney. *Accord Okla. Educ. Ass'n v. Alcoholic Beverage Laws Enfm't Comm'n*, 889 F.2d 929 (10th Cir. 1989) ("The [Supreme] Court . . . treats equal protection clause cases in which a party claims a fundamental right to pursue a particular line of employment differently from cases in which the right is asserted under the privileges and immunities clause. In the Equal Protection Clause context, the Supreme Court has never recognized a fundamental right to pursue a particular line of employment." (citing *United Bldg. & Constr. Trades*

*Council v. Mayor of Camden*, 465 U.S. 208, 219 (1984); *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 313 (1976))); *see also Schwarz v. Kogan*, 132 F.3d 1387, 1390 n.2 (11th Cir. 1998) ("[T]here is no fundamental right to practice law . . . .").

Plaintiff fights a losing battle to isolate his claims from the Supreme Court's determination in *Board of Trustees v. Garrett* that "[s]tates are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions towards such individuals are rational." 531 U.S. at 366. Based on this language and the inapplicability of the fundamental rights proffered by Plaintiff, the Court concludes that, in the context of professional licensing examinations, Title II does not enforce any fundamental right. Instead, this "class of cases . . . implicate[s] only [the] prohibition on irrational discrimination." *Constantine*, 411 F.3d at 486 (second alteration in original) (quoting *Lane*, 541 U.S. at 532 n.20).

## 2. Congress Has Not Identified a History of Irrational Disability Discrimination in Professional Licensing

Having determined the nature of the constitutional right in question, the Court must now "examine whether Congress identified a history and pattern of unconstitutional . . . discrimination . . . against the disabled" in the context of professional licensing. *Garrett*, 531 U.S. at 368. Since *Tennessee v. Lane*, the Fourth Circuit has accepted as "settled" that Congress's purpose in enacting Title II was to address "a pattern of unconstitutional disability discrimination by States and nonstate government entities with respect to the provision of public services." *Constantine*, 411 F.3d at 487. This case is distinguishable, however, because the alleged discrimination is not in the provision of

services, but in the treatment of disabled persons by a state body responsible for granting professional licenses.[8]

On that particular issue, "the legislative record of the ADA . . . simply fails to show that Congress did in fact identify a pattern of *irrational* state discrimination . . . against the disabled" in the context of professional licensing. *Garrett*, 531 U.S. at 368 (emphasis added). Irrational is the key word, given the absence of a fundamental right in issue and the state's compelling interest in regulating "the practice of professions within their boundaries." *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975) "[A]s part of their power to protect the public health, safety, and other valid interests [states] have broad power to establish standards for licensing practitioners and regulating the practice of professions." *Id.* "The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.'" *Id.*; *see also Schware v. Bd. of Bar Exam'rs of N.M.*, 353 U.S. 232, 239 (1957) ("A State can require high standards of qualification," as long as the qualifications are rationally related to the applicant's fitness to practice law).

The only record Plaintiff cites to show a history of irrational discrimination is the Federal Register summary of the ADAAA, which briefly mentions the "ADA rights in education and testing situations" created by Titles II and III and refers to Congress's "concern[] about the number of individuals with learning disabilities who were denied

---

[8] Generally speaking, Plaintiff's ADA claim is that the Board discriminated against him by applying the wrong standards in evaluating his disability and otherwise failing to provide him his desired accommodations. *See supra* Part I.

reasonable modifications or testing accommodations." 81 Fed. Reg. 53204, 53209.

Education-related testing is not the same as testing that serves as a gateway to

professional licensing, however, and it is not subject to the same compelling state

interests described above. In light of this scant congressional record and the fact that in

rational-basis review the Supreme Court imposes a higher standard of proof to establish

unconstitutional behavior, the Court finds no historical record to indicate that Congress

enacted Title II to address irrational disability discrimination in professional licensing .

*See Lane*, 541 U.S. at 529 (noting that where a statute is "targeted at . . . classifications,

which are subject to a heightened standard of judicial scrutiny, 'it was easier for Congress

to show a pattern of state constitutional violations' than in *Garrett* or *Kimel*, both of

which concerned legislation that targeted classifications subject to rational-basis review"

(quoting *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 735–36 (2003)));

*accord Guttman v. Khalsa*, 669 F.3d 1101, 1124 (10th Cir. 2012) ("Simply put, nothing

in the congressional record suggests Title II was a response to pervasive discrimination in

the area of professional licensing."); *Turner*, 561 F. App'x at 667–68; *Brewer v. Wis. Bd.

of Bar Exam'rs*, 270 F. App'x 418, 421 (7th Cir. 2008); *Roe v. Johnson*, 334 F. Supp. 2d

415, 422 (S.D.N.Y. 2004).[9]

---

[9] Plaintiff argues that it is improper to rely on *Guttman* and *Turner*, given that they are nonbinding precedent and they cite solely to cases that pre-date the ADAAA. Citing *Summers v. Altarum Institute*, Plaintiff contends that it is error to rely on pre-ADAAA cases, period. 740 F.3d 325, 330 (4th Cir. 2014). A closer read of that case, however, shows that the Fourth Circuit specifically found that it was error to base a disability determination on pre-ADAAA cases, given that the ADAAA expanded the ADA's definition of disability to create a more "liberal standard." *Id.* at 330, 330 n.2. As *Guttman* and *Turner* were not analyzing the language of the ADA/ADAAA, but rather its historical impetus, *Summers* is inapposite. Moreover, the Court does not "rely" on these cases; it simply notes that they, among others, have come to an identical conclusion through their own abrogation analyses.

### 3. Title II's Accommodation Requirement is not Congruent or Proportional in Professional Licensing Cases

The Court's final step in this analysis is to determine whether Title II "represent[s] a congruent and proportional response to [the] demonstrated history and pattern of discrimination" in professional licensing cases. *Constantine*, 411 F.3d at 488. In the words of the Supreme Court, "the appropriateness of the remedy depends on the gravity of the harm it seeks to prevent[:] 'Difficult and intractable problems often require powerful remedies,' [while] 'strong measures appropriate to address one harm may be an unwarranted response to another, lesser one.'" *Lane*, 541 U.S. at 523–24 (quoting *Kimel*, 528 U.S. at 88; *City of Boerne*, 521 U.S. at 530). This case appears to fall into the latter camp.

State professional licensing does not implicate any fundamental rights. Therefore, rational-basis review is appropriate. State practices surrounding licensing are owed deference, given the states' compelling interest in regulating professions operating in their boundaries—especially those like the medical and legal professions, which are imbued with public trust and the power to influence the lives of others. Additionally, Plaintiff has not demonstrated that Congress faced evidence of a widespread pattern of unconstitutional discrimination in professional licensing when Title II was passed. Thus, as applied to the historically "lesser" harm of disability discrimination in professional licensing, the strong measures created in Title II to address truly widespread deprivations of fundamental rights appear unwarranted. *See id.*

Moreover, this Court agrees with the Tenth Circuit that, "[a]lthough Title II permits some flexibility by requiring only reasonable efforts at accommodation, the statute's sweep is exceptionally broad. The abrogation of sovereign immunity here would require states to justify a significant range of rational, everyday licensing decisions that would otherwise be constitutional." *Guttman*, 669 F.3d at 1124. Every time, as here, a disgruntled bar applicant disagrees with the Board's decision to listen to one doctor over another with regard to accommodations, or in other cases disciplinary measures, the door would stand open to litigation in federal court. The potential magnitude of this opening counsels against abrogation, as does the fact that doing so may have Tenth Amendment consequences as well.

For all these reasons, the Court finds that the remedial scheme established by Title II is neither congruent nor proportional to the negligible history of disability-based discrimination in state-administered professional licensing, and that "it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior" in this context. *City of Boerne*, 521 U.S. at 532. As a result, the Court concludes that Title II, as it applies to the class of cases implicating professional licensing by the states, does not constitute a valid exercise of Congress's § 5 authority. Congress therefore did not validly abrogate sovereign immunity with regard to discrimination in the specific field of legal licensing, and the Court lacks jurisdiction over Plaintiff's ADA claim.

## C.     Sovereign Immunity Bars Plaintiff's Rehabilitation Act Claim

Count two asserts a claim against the Board under § 504 of the Rehabilitation Act ("RA"). The RA applies to, *inter alia*, any department, agency, or other instrumentality

of a state, if such entity accepts federal funds and thereby consents to suit. 29 U.S.C. §

794. If the entity does not accept federal funds, its sovereign immunity is preserved. The

department-specific structure of the statute makes clear that one arm of a state accepting

federal funds will not subjugate another arm to RA liability, so long as that second arm

does not accept any federal funds for itself. *Accord Jim C. v. United States*, 235 F.3d

1079, 1081 (8th Cir. 2000) ("A state and its instrumentalities can avoid § 504 of the

Rehabilitation Act's (Act) waiver requirement on a piecemeal basis, by simply accepting

federal funds for some departments and declining them for others."); *Koslow v.*

*Pennsylvania*, 302 F.3d 161, 171–72 (3d Cir. 2002).

To acknowledge the fact that "[s]tate sovereignty is among the Constitution's most

foundational principles," *Madison v. Virginia*, 474 F.3d 118, 129 (4th Cir. 2006), "a

waiver of the Government's sovereign immunity will be strictly construed, in terms of its

scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996). The waiver

must be knowing and voluntary, *Constantine*, 411 F.3d at 494–95, and the Supreme

Court has made clear that, when confronted with a purported waiver of the government's

sovereign immunity, the Court will "constru[e] ambiguities in favor of immunity."

*United States v. Williams*, 514 U.S. 527, 531 (1995) (citing *United States v. Nordic*

*Village, Inc.*, 503 U.S. 30, 33 (1992)).

In this case, Defendants have submitted a Declaration from Catherine Crooks Hill,

Secretary and Treasurer to the Board, stating under penalty of perjury that—contrary to

Plaintiff's allegation in the Amended Complaint (Am. Compl. ¶ 112)—the Board does

not receive funds or vouchers from the federal government. (Decl. ¶ 4, ECF No. 18-1.)

Because sovereign immunity raises a jurisdictional question, *Constantine*, 411 F.3d at 480, and because Defendants have challenged the factual basis for jurisdiction as set forth in the Amended Complaint, the Court is permitted to look beyond the complaint and consider this sworn statement. *See Jadhav*, 555 F.3d at 348.

Notwithstanding the inherent credibility of a statement under oath, Plaintiff refused to accept the Declaration on its face, and so the Court permitted discovery into the limited issue of the Board's financing. Despite this, Plaintiff was unable to find any evidence that the Board received federal funding. Counsel for Plaintiff conceded as much at the hearing on the Motion to Dismiss. Plaintiff nevertheless clings to the argument that, because the Virginia Supreme Court receives federal funding for programs, and because the Board is an arm of the Virginia Supreme Court, the Board indirectly benefits from the federal funds. (Br. Opp. Mot. Dismiss 11–12; Pl. Supp. Br. 3.) This position ignores the "piecemeal" structure of the RA's waiver provision, as well as the "knowing and voluntary" requirement imposed by the Fourth Circuit. The same goes for Plaintiff's unsupported argument that the Board receives federal funds in the form of vouchers supplied by other entities to cover Bar-takers' costs and fees. At the very least, such a scheme would give rise to ambiguity as to the Board's knowing acceptance of federal funds, and, as stated above, ambiguities are construed in favor of the sovereign in this analysis. *Williams*, 514 U.S. at 531.

The Court accordingly finds that the Board does not accept federal funds and has not waived its Eleventh Amendment sovereign immunity with regard to the RA. Therefore, the Court lacks jurisdiction over this claim.

**D.    Plaintiff Fails State a Claim for an Equal Protection Violation**

In Count Three of the Amended Complaint, Plaintiff first claims that the Board's actions violated his fundamental right to pursue his chosen profession or calling, in violation of the Fourteenth Amendment. For the reasons discussed above, *supra* Part B.1., the right to pursue one's chosen profession is not a fundamental right for Fourteenth Amendment purposes, so this claim fails. Next, Plaintiff claims that the Board's policies, practices, and procedures denied him equal access to the bar examination, and therefore the legal profession, by denying him "and other [sic] similarly situated" the accommodations necessary to "complete the 2016 Virginia Bar Examination on equal footing with other examinees." (Am. Compl. ¶¶ 121–22.)

In the Motion to Dismiss, Defendants argue that Plaintiff has failed to satisfactorily plead an Equal Protection Clause violation because he has not provided anything beyond conclusory allegations that he was treated differently from others similarly situated or alleged discriminatory animus. Plaintiff asserts that he has sufficiently pled that he was treated differently from similarly situated bar applicants in that he was not allowed to test on equal footing with them, with his desired accommodations. Plaintiff further argues that, because the Amended Complaint alleges that the Board was aware of the ADA and knowingly violated the statue, he has sufficiently pled discriminatory animus. For the reasons stated below, the Court finds that Plaintiff has failed to state a claim for violation of the Fourteenth Amendment.

The Equal Protection Clause of the Fourteenth Amendment declares that "[n]o State shall . . . deny to any person . . . the equal protection of the laws." U.S. Const.,

amend. XIV, § 1. This does not forbid states from classifying individuals at all; rather, it "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (internal quotation marks and alteration omitted). "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *King v. Rubenstein*, 825 F.3d 206, 220 (4th Cir. 2016) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). "[The court] must then consider 'whether the disparity in treatment can be justified under the requisite level of scrutiny.'" *Id.* (quoting *Garraghty*, 239 F.3d at 654).

At the first prong of the analysis, the Court finds that Plaintiff has failed to sufficiently allege that he was treated differently from other similarly situated test-takers. The Amended Complaint states simply that the Board "denied Plaintiff reasonable accommodations," yet it goes on to claim that this individual denial "discriminates against Plaintiff and other learning disabled and others with disabilities examinees [sic]." (Am. Compl. ¶ 121.) Plaintiff then proceeds to allege that the Board "is discriminating and violating the equal protection clause against Plaintiff, and other [sic] similarly situated, by denying learning disabled and other with disabilities examinees [sic] equal access to the bar examination and the legal profession." (*Id.* at 122.) These bare

allegations are insufficient for the Court to determine, accepting the pleadings as true, that the Board took an affirmative action towards or against Plaintiff that it did not take in the case of a similarly situated individual. The absence of firm comparators renders Plaintiff's claim nebulous at best, leaving the Court to wonder if Plaintiff is similarly situated to a test-taker without disabilities, or to a test-taker who was similarly disabled yet granted accommodations while Plaintiff was not. Such an ambiguous claim is not viable. *See Twombly*, 550 U.S. at 555; *cf. Rubenstein*, 825 F.3d at 221 (affirming that the plaintiff sufficiently alleged intentional disparity in his treatment when the complaint alleged facts regarding two similarly situated individuals and the circumstances of their interactions with the defendant, and how those interactions differed from the plaintiff's). Accordingly, the Court finds that the Amended Complaint fails to plead unequal treatment that resulted from intentional or purposeful discrimination.

Even if Plaintiff had alleged sufficient facts to state an intentional disparity in his treatment, his equal protection claim would still fail at the second prong. "In general, unless a suspect class is involved, disparate treatment 'is presumed to be valid and will be sustained "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose."'" *Id.* (quoting *Veney v. Wyche*, 293 F.3d 726, 731 (4th Cir. 2002) (quoting *Heller v. Doe*, 509 U.S. 312, 319–20 (1993))). The disabled are not a suspect class. *Garrett*, 531 U.S. at 366 (2001). To the extent Plaintiff claims his disparate treatment was that he was not placed on what he perceived to be equal footing with other test-takers, the state has a rational and legitimate interest in preserving the integrity of the bar examination, given that the process of attorney qualification and

licensing impacts the public interest. *See Goldfarb*, 421 U.S. at 792. Moreover, given that the Board does grant accommodations when it finds them to be warranted, the fact that it determined that accommodations were not warranted in Plaintiff's case does not alone render the Board's policies and procedures unconstitutional.

Taking the allegations in Plaintiff's Amended Complaint as true, the Board provided extensive justifications for its denial of Plaintiff's requested accommodations. While Plaintiff has alleged that he does not agree with the Board's decision, he has not alleged facts to show that the decision was arbitrary and capricious, or otherwise divorced from the Board's purpose in regulating and administering the bar examination. For these reasons and those stated above, Plaintiff has failed to state a claim for a violation of the Equal Protection Clause.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 17) will be granted in full.[10] An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
United States District Judge

Date: *April 26, 2018*
Richmond, VA

---

[10] Although the Court has found that Plaintiff is not entitled to the legal remedy he seeks, it is nevertheless hopeful that he will, like many others, attempt the Virginia Bar Examination a second time and go on to obtain a license to practice law in this state.